IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | | |
|---|---|---|---|
| **GE BUSINESS FINANCIAL SERVICES :** | | | |
| **INC., formerly known as Merrill Lynch** | : | | |
| **Business Financial Services Inc.** | : | | |
| | : | **Case No.:** | **1:09-cv-4368** |
| **Plaintiff,** | : | | |
| | : | | |
| **v.** | : | | |
| | : | **Judge Samuel Der-Yeghiayan** | |
| **ALAN T. SCHIFFMAN and** | : | | |
| **WILLIAM PETER RIDGEWAY CROSS:** | | **Mag. Judge Arlander Keys** | |
| | : | | |
| **Defendants.** | : | | |

## DEFENDANT WILLIAM PETER RIDGEWAY CROSS' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12

Defendant William Peter Ridgeway Cross ("Cross") has moved to dismiss plaintiff GE

Business Financial Services, Inc.'s ("GE") action to collect unspecified sums under a guaranty.

The cornerstone of Cross' Motion is based on the original action between the parties in which a

Georgia court of competent jurisdiction held GE sheriff-saled to itself the property which secured

the debt for less than fair market value, failed to establish a deficiency exists, and failed to give

the court good cause to order a resale. Consequently, GE cannot establish any deficiency is due

on the underlying debt as a matter of law.

GE asserts that the guaranty waives all such defenses and, because the guaranty is subject

to Illinois, not Georgia law, the Georgia proceedings are neither *res judicata* nor entitled to full

faith and credit. GE asserts this position even though both the Georgia venue and its law were

chosen in the documents drafted by GE, and even though a "waiver of all defenses" does not

allow collection of a debt GE has failed to establish exists, and even though under both Illinois

and Georgia law, the failure to have the foreclosure confirmed and to establish that a deficiency exists is fatal.

## A.    This Action Is Not Governed Solely By Illinois Law.

Just as plaintiff failed to inform the Court in its Complaint that a Georgia court refused to confirm the foreclosure proceedings, it again failed to inform the Court, in its response to Cross' Motion, that the agreement governing that transaction contained a Georgia choice of law provision.

Because Georgia is a "deed of trust" state, the deed and mortgage are contained in a single recorded document. The document in this transaction, titled "Deed to Secure Debt and Security Agreement" (see Exhibit "A" attached), granted the lender liens not only on the real property, but also on all personal property of the debtor (Section 1.1(c)). Consequently, plaintiff foreclosed on and sold both the real estate and all the personal property contained in 248 apartment units, as well as equipment, etc.

Under the "applicable law" provisions of the Deed to Secure Debt and Security Agreement (Section 7.6), "The creation, perfection and enforcement of the lien of this deed shall be governed by the law of the state in which the property is located." That state is Georgia - not Illinois.[1] Thus, GE was required to apply both Georgia law and procedure in its foreclosure action. Consequently, it was Georgia's statutes, not Illinois', which controlled the foreclosure, the confirmation procedure, the scrutiny of the lender's conduct, and the right to a deficiency judgment. Accordingly, GE is bound by the findings of the Georgia court, whose jurisdiction it

---

[1]     The clause limits Illinois law to any remaining issues.

chose. The guaranty merely utilizes Illinois law to collect any deficiency determined to exist in

the Georgia proceeding.[2] As has already been established, no deficiency exists under Georgia

law - and any action against the guarantors is prohibited.

Next, GE argues Cross' guaranty "waived" his right to assert the defense of no deficiency

because Illinois law allows that defense to be waived. This argument likewise fails. Under

Illinois law:

> Even though the lender's remedies - which often are articulated in
> the promissory note and various mortgage documents - may be
> exercised concurrently, the secured party is 'limited to one
> satisfaction.' *Skach v. Lydon 16 Ill.App. 3d 610, 306 N.E. 2d 482,*
> *485 (Ill. 1973)(citation omitted); accord, e.g., In re Linane, 291*
> *B.R. 457, 460 (Bankr. N.D. Ill. 2003)* ('In Illinois, the right in any
> foreclosure proceedings to proceed against the property and, in
> addition to secure a money judgment for any deficiency, provided
> the creditor receives only one satisfaction, is clear.') (citations and
> quotations omitted); *Farmer City State Bank v. Champaign Nat'l*
> *Bank, 138 Ill. App. 3d 847, 93 Ill. Dec. 200, 486 N.E. 2d 301, 307*
> *(Ill. App. Ct. 1985)*.

Plaintiff has failed to cite, and Cross had been unable to find a single case in which a guarantor

has been required to pay any sum after foreclosure without a finding by the court in which the

foreclosure occurred that a deficiency exists.

Interestingly, even if we apply Illinois law, the result would, in all likelihood, be identical

because in Illinois - just as in Georgia - no deficiency judgment can be obtained if a court of

competent jurisdiction does not confirm the sale.

---

[2]     As defendant noted in its original Motion, GE's guaranty gives Illinois "non-
exclusive" jurisdiction. GE already pursued the guarantors in the Georgia action - yet here
attempts to do so again.

3

The Court will recall that under Georgia under, whenever a foreclosure does not bring the amount of the debt secured ... the person instituting the foreclosure proceeding shall ... report the sale to the judge of the superior court ... for confirmation and approval and shall obtain an order of confirmation and approval thereon." Similarly, under the Illinois Mortgage and Foreclosure Law [3], before a foreclosure sale is complete "... the court shall conduct a hearing to confirm the sale". 735 ILCS 5/15-1508(b). There are legions of Illinois cases which make it clear a judicial foreclosure sale is not complete until it has been confirmed by the court. *Household Bank, FSB v. Lewis*, *App. 1 Dist. 2007, 311 Ill. Dec. 677, 373 Ill. App.3d 420, 869 N.E.2d 351, appeal allowed 314 Ill. Dec. 824, 225 Ill.2d 632, 875 N.E.2d 1111, reversed 322 Ill. Dec. 15, 229 Ill.2d 173, 890 N.E.2d 934*; *Grubert v. Cosmopolitan Nat. Bank of Chicago*, *App. 2 Dist. 1995, 206 Ill. Dec. 555, 269 Ill. App.3d 408, 645 N.E.2d 560*. Further, as noted in *Freedom Mortgage Corp. v. Burnham Mortgage, Inc.*, *2006 WL 695465 at 6 (N.D. Ill. March 13, 2006)*, a case relied on by GE in its brief, "the court is not required to confirm a sale" - just as it is not required to confirm the sale in Georgia.

Under the confirmation procedure set forth in the IMFL, "the trial court has broad discretion to approve or disapprove a judicial foreclosure sale", just as it does in Georgia. *JP Morgan Chase Bank v. Fankhauser*, *App. 2 Dist. 2008, 321 Ill. Dec. 870, 383 Ill. App.3d 254, 890, N.E.2d 592*. See, also *JP Morgan, supra*; *Commercial Credit Loans, Inc. v. Espinoza*, *App. 1 Dist. 1997, 228 Ill. Dec. 410, 293 Ill. App.3d 915, 689 N.E.2d 282*. *Fleet Mortg. Corp. v. Deale*, *App. 1 Dist. 1997, 222 Ill. Dec. 628, 287 Ill. App.3d 385, 678 N.E.2d 35*. Further, a court

---

[3]     The process of instituting and prosecuting an Illinois foreclosure action is set forth in the Illinois Mortgage Foreclosure Law ("IMFL") 735 ILCS 5/15-11-01 *et seq*.

4

is justified in refusing to approve a judicial sale which is prejudicial to an interested party - just as it is in Georgia. ***Citicorp Sav. of Illinois v. First Chicago Trust Co. of Illinois***, *App. 1 Dist. 1995, 206 Ill. Dec. 786 ,269 Ill. App.3d 293, 645 N.E.2d 1038, appeal denied 209 Ill. Dec. 800, 162 Ill.2d 565, 652 N.E.2d 340* (emphasis added).

Under either Illinois or Georgia law, a confirmation hearing of the sale is required, during which the lender must show it acted properly - and the court has broad discretion to refuse confirmation if the lender failed to meet its burden.

The Georgia statute is specific that "no action may be taken to obtain a deficiency judgment unless the person instituting the foreclosure proceeding shall ... obtain an order of confirmation and approval thereon". This GE failed to do. (GE's conduct in Georgia was such that the court found GE was not entitled to a resale.) Likewise, under Illinois law, a confirmation of the sale must occur before a deficiency can exist.

Thus, even if the events were "construed in accordance with the internal laws of the State of Illinois ... ", as trumpeted in GE's Response to Cross's Motion, plaintiff would not be entitled to recovery under the guaranty, as it failed to obtain a deficiency judgment during the confirmation process.

Undeterred, plaintiff asserts that the guarantors nevertheless waived even this right. However, if plaintiff's interpretation of a guarantor's waiver of rights is taken to its logical conclusion, it would include collection of the original debt as many times as plaintiff chooses, since GE could litigate repeatedly against the guarantors who "waived" all defenses. Such a result is, of course, absurd. After foreclosure, there can be no recovery against a guarantor unless there is a deficiency. There can be no deficiency unless there is a confirmation of the sale by a

5

court of competent jurisdiction. Here, the sale was not confirmed. Under Georgia law, no deficiency can result from an unconfirmed sale. Under Illinois law, a lender is likewise precluded from proceeding in such an event.

In a final desperate attempt to enforce the guaranty, plaintiff argues that defendants waived any "anti-deficiency statute" that might exist. However, the applicable Georgia statute is not an anti-deficiency statute. Rather, it is a confirmation statute that, as already discussed, is very similar to the one which exists under Illinois law. The point of both statutes is that the conduct of the lender in foreclosure is always subject to scrutiny and further action against borrowers and guarantors will be prohibited if "justice was otherwise not done" during the foreclosure process. (See Illinois Mortgage Foreclosure Law 735 ILCS 5/15-1508(b) (2004).)

In order to grant the relief requested by plaintiff, this Court must find that the Deed to Secure Debt and Security Agreement, which contained the Georgia choice of law provision, should be ignored. The Court must also find the results of the Georgia confirmation hearing should be ignored and, finally, the fact that a confirmation under the Illinois Mortgage Foreclosure Laws would have likely reached the same result should be ignored. Finally, the Court has to somehow divine the amount of an alleged deficiency that the true court of competent jurisdiction, the Superior Court of Fayette County, Georgia refused to determine exists.

Respectfully submitted,

/s/ Joseph A. Caprara
JOSEPH A. CAPRARA, ESQUIRE
jcaprara@capraralaw.com

6

*Local Counsel*
Mark G. Poulakidas (ARDC No. 62320065)
Haynes, Studicka, Kahan, O'Neill & Poulakidas, LLC
200 West Adams Street, Suite 500
Chicago, IL 60606
312-332-6644

*Pro Hac Vice*
Joseph A. Caprara
Caprara Law Offices
633 W. Germantown Pike, Suite 103
Plymouth Meeting, PA 19462
215-616-8600

## CERTIFICATE OF SERVICE

I, Joseph A. Caprara, an attorney, do hereby certify that I have caused a true and correct copy of the foregoing Reply to Plaintiff's Response to Defendants' Motion to Dismiss Complaint to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filings to all attorneys of record on this 20th day of November 2009.


/s/ Joseph A. Caprara
jcaprara@capraralaw.com

# Exhibit A

## (Security Deed)

After Recording, Return To:

Seyfarth Shaw LLP
Two Seaport Lane, Suite 300
Boston, MA 02210
Attn: Andrew M. Pearlstein, Esq.

RECORD AND RETURN TO:
R.E. Hodges, Jr., Esq.
2230 Towne Lake Parkway
Bldg. 200; Ste. 120
Woodstock, Georgia 30189
H09+.113

Doc ID: 007576840027 Type: GR
Filed: 08/13/2007 at 09:15:00 AM
Fee Amt: $62.00 Page 1 of 27
Fayette. Ga. Clerk Superior Court
Sheila Studdard Clerk of Court
BK 3280 PG 295-321

(Above Space for Recorder's Use)



# DEED TO SECURE DEBT AND SECURITY AGREEMENT

## MADE BY

## IBS COBBLESTONE OPERATING, LLC,
a Georgia limited liability company

as "Borrower"

to

## MERRILL LYNCH CAPITAL, a
Division of Merrill Lynch Business Financial Services Inc.,
a Delaware corporation

as "Lender"

BO1 15867819.3 / 37050-000044

## DEED TO SECURE DEBT AND SECURITY AGREEMENT

Project Commonly Known as
"Cobblestone Fayette"

THIS DEED TO SECURE DEBT AND SECURITY AGREEMENT (hereinafter referred to as the "Deed") is made as of August 8, 2007, by IBS COBBLESTONE OPERATING, LLC, a Georgia limited liability company, whose address is c/o Naples Realty Group, L.L.C, 2235 Venetian Court, Suite 5, Naples, Florida 34109 ("Borrower"), in favor of MERRILL, LYNCH CAPITAL, a division of Merrill Lynch Capital Financial Services Inc., a Delaware corporation, its successors and assigns, whose address is 222 N. LaSalle Street, 16th Floor, Chicago, Illinois 60601 ("Lender").

## RECITALS

Lender has agreed, subject to the terms and conditions of that certain Loan Agreement dated August 8, 2007, executed by and between Borrower and Lender (the "Loan Agreement"), to make a loan (the "Loan") to Borrower. The Loan is evidenced by that certain Promissory Note of even date herewith in the original principal amount of TWENTY ONE MILLION SIX HUNDRED THOUSAND AND 00/100 DOLLARS ($21,600,000.00) (which note, together with all notes issued in substitution or exchange therefor and all amendments thereto, is hereinafter referred to as the "Note"), providing for monthly payments as set forth in the Note, with the balance thereof, due and payable on August 1, 2010 (said date or any earlier date on which the entire unpaid principal amount shall be paid or required to be paid in full, whether by prepayment, acceleration or otherwise is hereinafter called the "Maturity Date"). The terms and provisions of the Loan Agreement and Note are hereby incorporated by reference in this Deed.

This Deed is to secure: (i) the payment of the Note, together with all interest, premiums, and other amounts, if any, due in accordance with the terms of the Note, as well as the payment of any additional indebtedness accruing to Lender on account of any future payments, advances or expenditures made by Lender pursuant to the Note, the Loan Agreement or this Deed or any of the other Loan Documents or otherwise in connection with the Loan (all payment obligations are hereinafter referred to as the "Indebtedness") and (ii) the performance of all other obligations and covenants under the Loan Documents.

## I. Grant  d S     d   l

1.1   Grant. For the purpose of securing payment of the Indebtedness and performance of the Secured Obligations defined and described in Section 1.2 below, and in order to secure the indebtedness and other obligations of Borrower hereinafter set forth, Borrower hereby irrevocably and unconditionally grants, bargains, sells, conveys; mortgages, assigns, pledges, warrants and transfers to Lender, all interests which Borrower now has or may later acquire, in and to the following property (all or any part of such property, or any interest in all or any part of it, as the context may require, the "Property"):

(a)   The real property described in Exhibit A, together with all existing and future easements and rights affording access to it (the "Premises"); together with

(b)   All buildings, structures, improvements and fixtures now or in the future located or to be constructed on the Premises (the "Improvements"); together with

(c)     All existing and future appurtenances, privileges, rights-of-way, franchises and tenements of the Premises, including all mineral rights, oil, gas, and associated substances, and other commercially valuable substances which may be in, under or produced from any part of the Premises, all development rights and credits, air rights, water, water rights (whether riparian, appropriative or otherwise, and whether or not appurtenant) and water stock, and any Premises lying in the streets, roads or avenues, open or proposed, in front of or adjoining the Premises and Improvements; together with

(d)     All existing and future Leases, subleases, subtenancies, licenses, occupancy agreements and concessions ("Leases") relating to the use and enjoyment of all or any part of the Premises and Improvements, and any and all guaranties and other agreements relating to or made in connection with any of such Leases and all rents, income, revenues, prepayments, security deposits, tax, insurance and replacement reserve deposits, receipts, termination, cancellation, and option payments, royalties, profits, issues, service reimbursements, fees, accounts receivables, and revenues from the Premises and/or Improvements from time to time accruing under the Leases (the "Rents"); together with

(e)     All materials, supplies, work in process, chattels, furniture, fixtures, appliances, machinery and other personal property of any kind, now or later to be attached to, incorporated into, placed in, on or about, or used in connection with the use, enjoyment, occupancy or operation of all or any part of the Premises and Improvements, whether stored on the Premises or elsewhere, including all pumping plants, engines, pipes, ditches and flumes, and also all gas, electric, cooking, heating, cooling, air conditioning, lighting, refrigeration and plumbing fixtures and equipment, all of which shall be considered to the fullest extent of the law to be real property for purposes of this Deed; together with

(f)     All of Borrower's interest in and to all operating accounts, the Loan funds, whether disbursed or not, all deposit accounts, including, without limitation, the Deposit Account, the Cash Management Account, all Reserve Accounts, including, without limitation, Operating Expense Reserve Funds, Extraordinary Expense Reserve Funds, Interest Reserve Funds and Replacement Reserve Funds, and any other monies on deposit with or for the benefit of Lender, including deposits for the payment of real estate taxes and insurance and any cash collateral accounts or bank accounts of Borrower; together with

(g)     All claims, demands, judgments, insurance policies, insurance proceeds, refunds, reserves, accounts receivable, cost savings, deposits, rights of action, awards of damages, compensation, settlements and other rights to the payment of money hereafter made resulting from or relating to (i) the taking of the Premises or the Improvements or any part thereof under the power of eminent domain, (ii) any damage (whether caused by such taking, by casualty or otherwise) to the Premises, Improvements or appurtenances thereto or any part thereof, or (iii) the ownership or operation of the Property; together with

(h)     To the extent assignable, all management contracts, permits, licenses, applications, approvals, plans, specifications and drawings, contracts, purchase and sale agreements, purchase options, entitlements, soil test reports, other reports of examination or analysis of the Premises or the Improvements, development rights and authorizations,

however characterized, issued or in any way furnished for the acquisition, construction, development, operation and use of the Premises, Improvements and/or Leases, including building permits, environmental certificates, certificates of operation, warranties and guaranties; together with

(i)   All of the following types of collateral, as defined in the UCC: accounts, contract rights, general intangibles, chattel paper, documents, instruments, inventory, goods, equipment, investment property, deposit accounts, letter of credit rights, commercial tort claims, health care receivables and all books and records relating to the foregoing, provided that Borrower will cooperate with Lender in obtaining "control" as defined in the UCC with respect to collateral consisting of deposit accounts, investment property, letter of credit rights and electronic chattel paper; together with

(j)   All books and records pertaining to any and all of the property described above, including computer-readable memory and any computer hardware or software necessary to access and process such memory ("Books and Records"); together with

(k)   All proceeds and products and renewals of, additions and accretions to, substitutions and replacements for, and changes in any of the property described above; and together with

(l)   Any and all after-acquired right, title or interest of Borrower in and to any property of the types described in the preceding granting clauses.

The Recitals and Exhibits to this Deed are hereby incorporated in this Deed.  Capitalized terms used above and elsewhere in this Deed without definition have the meanings given them in the Loan Agreement.

TOGETHER WITH all and singular the rights, tenements, hereditaments, members and appurtenances whatsoever, in any way belonging, relating or appertaining to any of the Property hereinabove mentioned or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by the Borrower, including but not limited to, all rents, profits, issues and revenues of the Property from time to time accruing, whether under leases or tenancies now existing or hereafter created, reserving only the right to the Borrower to collect the same for its own account so long as the Borrower is not in default hereunder.

TO HAVE AND TO HOLD the Property and all parts, rights, members and appurtenances thereof, to the use, benefit and behoof of the Lender, its successors and assigns, IN FEE SIMPLE forever; and Borrower covenants that Borrower is lawfully seized and possessed of the Property and has good right to convey the same, that the same are unencumbered except for the Permitted Encumbrances expressly set forth in Exhibit "B" attached hereto and incorporated herein, and that Borrower does warrant and will forever defend the title thereto against the claims of all persons whomsoever, except as to the Permitted Encumbrances.

This Deed is a deed passing the title to the Property to the Lender and is made under those provisions of the existing laws of the State of Georgia relating to deeds to secure debt, and is not a mortgage, and is given to secure the payment of the Secured Obligations, as hereinafter defined.

Should the Secured Obligations be paid according to the tenor and effect thereof when the same shall become due and payable, and should Borrower perform all covenants herein contained in a timely manner, then this Deed shall be promptly canceled and surrendered.

1.2 Secured Obligations.

(a) Borrower makes the grant, conveyance, and mortgage set forth in Section 1.1 above, and grants the security interest set forth in Section 3 below for the purpose of securing the following obligations (the "Secured Obligations") in any order of priority that Lender may choose:

(i) Payment and performance of all obligations of Borrower and/or Principals under the Loan Documents;

(ii) Payment and performance of all future advances and other obligations that Borrower or any successor in ownership of all or part of the Property may agree to pay and/or perform (whether as principal, surety or guarantor) for the benefit of Lender, when a writing evidences the parties' agreement that the advance or obligation be secured by this Deed;

(iii) Payment and performance of all modifications, amendments, extensions, and renewals, however evidenced, of any of the Secured Obligations; and

(iv) Payment of any and all loan commissions, service charges, liquidated damages, Expenses and advances due to or incurred by Lender regardless of whether any Loan proceeds have been disbursed.

(b) All persons who may have or acquire an interest in all or any part of the Property will be considered to have notice of, and will be bound by, the terms of the Secured Obligations and each other agreement or instrument made or entered into in connection with each of the Secured Obligations. Such terms include any provisions in the Note or the Loan Agreement which permit borrowing, repayment and reborrowing, or which provide that the interest rate on one or more of the Secured Obligations may vary from time to time.

2. Assignment of Leases and Rents.

2.1 Assignment. Borrower hereby irrevocably, absolutely, presently and unconditionally assigns to Lender all Leases and Rents and other benefits of the Property, whether now due, past due or to become due, including all prepaid rents and security deposits. This is an absolute assignment, not an assignment for security only and shall continue in effect until the Indebtedness is paid in full and all Secured Obligations are fully satisfied. Borrower hereby gives Lender, subject to the License (as defined below), the right to collect the Rents and apply them in payment of the principal, interest and all other sums payable under the Loan Documents.

2.2 Grant of License. Lender hereby confers upon Borrower a revocable license ("License") to enforce the Leases and collect and retain the Rents as they become due and payable so long as no Event of Default, as defined in Section 6.2 below, shall exist and be

Deed to Secure Debt and Security Agreement         - 4 -
BOI 15867819.3137050-000044

continuing. Borrower shall deliver such Rents to Lender as are necessary for the payment of principal, interest and other sums payable under the Loan Documents as such sums become due. If an Event of Default has occurred and is continuing, Lender shall have the right, which it may choose to exercise in its sole discretion and which it may exercise without taking possession of the Property, to terminate this License without notice to or demand upon Borrower, and without regard to the adequacy of Lender's security under this Deed.

2.3    Collection and Application of Rents. Subject to the License granted to Borrower under Section 2.2 above, Lender has the right, power and authority to collect any and all Rents. Borrower hereby appoints Lender its attorney-in-fact to perform any and all of the following acts, if and at the times when Lender in its sole discretion may so choose subject to the License:

(a)    Demand, receive and enforce payment of any and all Rents; or

(b)    Give receipts, releases and satisfactions for any and all Rents; or

(c)    Sue either in the name of Borrower or in the name of Lender for any and all Rents.

Lender and Borrower agree that the mere recordation of the assignment granted herein entitles Lender immediately to collect and receive rents upon the occurrence of an Event of Default, as defined in Section 6.2, without first taking any acts of enforcement under applicable law, such as, but not limited to, providing notice to Borrower, filing foreclosure proceedings, or seeking and/or obtaining the appointment of a receiver. Further, Lender's right to the Rents does not depend on whether or not Lender takes possession of the Property as permitted under Subsection 6.4. In Lender's sole discretion, Lender may choose to collect Rents either with or without taking possession of the Property. Lender shall apply all Rents collected by it in the following manner:

(a)    first, to pay the portion of the Secured Obligations attributable to the costs and expenses of operation and collection that may be incurred by Lender or receiver;

(b)    second, to pay all other Secured Obligations in any order and proportions as Lender in its sole discretion may choose; and

(c)    third, to remit the remainder, if any, to the person or persons entitled to it.

If an Event of Default occurs while Lender is in possession of all or part of the Property and is collecting and applying Rents as permitted under this Deed, Lender and any receiver shall nevertheless be entitled to exercise and invoke every right and remedy afforded any of them under this Deed and at law or in equity.

2.4    Lender Not Responsible. Under no circumstances shall Lender have any duty to produce Rents from the Property. Regardless of whether or not Lender, in person or by agent, takes actual possession of the Premises and Improvements, unless Lender agrees in writing to the contrary, Lender is not and shall not be deemed to be:

(a)    A "mortgagee in possession" for any purpose; or

(b)    Responsible for performing any of the obligations of the lessor under any lease; or

(c)     Responsible for the control, care, management, or repair of the property or any personal property or for any waste committed by lessees or any other parties, any dangerous or defective condition of the Property, or any negligence in the management, upkeep, repair or control of the Property;

(d)     Liable in any manner for the Property or the use, occupancy, enjoyment or operation of all or any part of it; or

(e)     Liable in any way for any injury or damage to any person or property sustained by any person or persons, firm, or corporation in or about the Property.

2.5 - **Leasing.** Borrower shall comply with and observe Borrower's obligations as landlord under all Leases and shall remain liable under the Leases. Borrower shall not, without Lender's prior written consent, which consent shall not be unreasonably withheld or delayed, execute, modify, amend, surrender or terminate any commercial Lease (residential, mobile home park and self storage leases shall not require Lender's consent). All Leases of space in the Property and amendments thereto shall be in accordance with the terms of the Loan Agreement.

## 3.   Grant of Security Interest.

3.1     **Security Agreement.** The parties intend for this Deed to create a lien on the Property, and an absolute assignment of the Rents, all in favor of Lender. The parties acknowledge that some of the Property and some or all of the Rents may be determined under applicable law to be personal property or fixtures. To the extent that any Property or Rents may be or be determined to be personal property, Borrower as debtor hereby grants Lender as secured party a security interest in all such Property (including, any replacement or substituted property) and Rents, to secure payment and performance of the Secured Obligations. This Deed constitutes a security agreement under the UCC, covering all such Property and Rents. Lender shall have all of the rights and remedies of a secured party under the UCC, as well as all other rights and remedies available at law or in equity.

3.2     **Financing Statements.** Borrower shall execute one or more financing statements and such other documents as Lender may from time to time require to perfect or continue the perfection of Lender's security interest in any Property or Rents. As provided in Section 5.7 below, Borrower shall pay all fees and costs that Lender may incur in filing this Deed (including any extensions, renewals and amendments thereof and reproductions of this Deed) and such other documents in public offices and in obtaining such record searches as Lender may reasonably require. In case Borrower fails to execute any financing statements or other documents for the perfection or continuation of any security interest or in the event Lender chooses to execute such financing statement on Borrower's behalf, Borrower hereby authorizes and empowers Lender and irrevocably appoints Lender as Borrower's agent and attorney-in-fact to execute and file, on Borrower's behalf, all financing statements, refilings, amendments, renewals and continuations thereof as Lender deems necessary or advisable to create, preserve and protect such lien. If any financing statement or other document is filed in the records normally pertaining to personal property, that filing shall never be construed as in any way derogating from or impairing this Deed or the rights or obligations of the parties under it.

4.   **Fixture Filing;.**

This Deed constitutes a financing statement filed as a fixture filing under Article 9 of the UCC, as amended or recodified from time to time, covering any Property which now is or·later may become fixtures attached to the Premises or Improvements. For this purpose, the respective addresses of Borrower, as debtor, and Lender, as secured party, are as set forth in the preambles of this Deed.  The Borrower hereby irrevocably constitutes and appoints the Lender as the Borrower's true and lawful attorney,·coupled with an interest, for the purpose of signing and filing or recording on behalf of the Borrower any financing or other statement in order to establish, perfect or protect the Bank's interest in the Collateral.  After an Event of Default, the Lender or its agents or attorneys shall have the right without further notice or demand or legal process (unless the same shall be required by applicable law), personally, or by its agents or attorneys, (i) to enter upon, occupy and use any premises owned or leased by Borrower or where the Property is located (or is believed to be located) for so long as such entry, occupancy and use is necessary, without any obligation to pay rent to Borrower, to render the Property useable or saleable and to remove the Property or any part thereof therefrom to the premises of the Lender or any agent of Lender for such time as Lender may desire in order to effectively collect or liquidate the Property and use in connection with such removal any and all services, supplies and other facilities of Borrower; (ii) to make copies of and have access to Borrower's original books and records, to obtain access to Borrower's data processing equipment, computer hardware and software relating to the Property and to use all of the foregoing and the information contained therein in any manner the Lender deems appropriate; and (iii) to notify postal authorities to change the address for delivery of Borrower's mail to an address designated by the Lender and to receive, open and dispose of all mail addressed to Borrower.  For the purpose of carrying out the provisions of this Section 4, the Borrower hereby constitutes and appoints the Lender the true and lawful attorney in fact of the Borrower, coupled with an interest, to do and perform, from time to time, any and all actions necessary and incidental to such purpose and does, by these presents, ratify and confirm any and all actions of said attorney in fact..

5.   **Rights and Duties of the Parties.**

.5.1      Representations and Warranties.  Borrower represents and warrants that:

(a)      Borrower has the full and unlimited power, right and authority to encumber the Property and assign the Leases and Rents; and

(b)      This Deed creates a first and prior lien on the Property subject to the Permitted Exceptions.

5.2      Performance of Secured Obligations.  Borrower shall promptly pay and perform each Secured Obligation in accordance with its terms.

5.3      Liens. Charges and Encumbrances.

(a)      Subject to any rights to contest set forth in the Loan Agreement, Borrower will promptly pay when due all bills and costs for work, services, equipment, labor, materials and specifically fabricated materials ("**Labor and Material Costs**") incurred in connection with the Property.

(b)     Borrower shall not permit to be created or exist in respect of the Property or any part thereof, any other or additional Lien or security interest other than the Liens and security interests created hereby and by the other Loan Documents; provided, however, that the foregoing shall not be a default if, in respect of a construction, mechanic's or materialman's lien asserted against any or all of the Property for Labor and Material Costs (each, a "Mechanic's Lien"): (i) Borrower shall have provided Lender with written notice of such Mechanic's Lien within five (5) days of such Mechanic's Lien encumbering the Property; (ii) within twenty (20) days of the earlier of written notice by Borrower to Lender of the existence of such Mechanic's Lien or written notice by Lender to Borrower of the existence of the Mechanic's Lien, Borrower shall have provided such security to Lender as is required under Section 4.2.2 of the Loan Agreement; (iii) no Event of Default shall have occurred and be continuing; (iv) Borrower shall in good faith at all times diligently prosecute the discharge of such Mechanic's Lien; and (v) neither the Property nor any part thereof nor any interest therein shall be in danger of being sold, forfeited, terminated, canceled or lost.

5.4     **Damages and Insurance and Condemnation Proceeds.**  In the event of any casualty or condemnation of the Property, the provisions of Article V of the Loan Agreement shall govern.

5.5     **Releases, Extensions, Modifications and Additional Security.**  From time to time, Lender may perform any of the following acts without affecting the liability of Borrower or any other person liable for the payment of the Indebtedness, and without affecting the lien or charge of the Deed as security for the payment of the Indebtedness, incurring any liability or giving notice to any person:

(a)     Release any person liable for payment of any Secured Obligation;

(b)     Waive or modify any provision of this Deed or the other Loan Documents or grant other indulgences, including, extending the time for payment, or otherwise altering the terms of payment, of any Secured Obligation;

(c)     Accept additional real or personal property of any kind as security for any Secured Obligation, whether evidenced by deeds of trust, mortgages, security agreements or any other instruments of security;

(d)     Alter, substitute or release any property securing the Secured Obligations;

(e)     Consent to the making of any plat or map of the Property or any part of it;

(f)     Join in granting any easement or creating any restriction affecting the Property;

(g)     Join in any subordination or other agreement affecting this Deed or the lien of it; or

(h)     Release the Property or any part of it.

5.6     **Release.**  When all of the Secured Obligations have been paid in full and all fees and other sums owed by Borrower under this Deed and the other Loan Documents have been received, Lender shall release this Deed, the lien created thereby, and all notes and instruments

Deed to Secure Debt and Security Agreement          - 8 -
BOI 15867819.3137050-000044

evidencing the Secured Obligations. Borrower shall pay any costs of preparation and recordation of such release.

5.7. <u>Compensation, Exculpation, Indemnification</u>.

(a)     Borrower agrees to pay fees in the maximum amounts legally permitted, or reasonable fees as may be charged by Lender when the law provides no maximum limit, for any services that Lender may render in connection with this Deed, including Lender's providing a statement of the Secured Obligations or providing the release pursuant to <u>Section 5.6</u> above. Borrower shall also pay or reimburse all of Lender's costs and expenses which may be incurred in rendering any such services. Borrower further agrees to pay or reimburse Lender for all costs, expenses and other advances which may be incurred or made by Lender in any efforts to enforce any terms of this Deed or to protect the rights under this Deed or the other Loan Documents, including any rights or remedies afforded to Lender under <u>Section 6</u>, whether any lawsuit is filed or not, or in defending any action or proceeding arising under or relating to this Deed, including reasonable attorneys' fees and other legal costs, costs of any foreclosure sale and any cost of evidence of title. If Lender chooses to dispose of Property through more than one foreclosure sale, Borrower shall pay all costs, expenses or other advances that may be incurred or made by Lender in each of such foreclosure sales.

(b)     Lender shall not be directly or indirectly liable to Borrower or any other person as a consequence of any of the following:

(i)     Lender's exercise of or failure to exercise any rights, remedies or powers granted to Lender in this Deed;

(ii)     Lender's failure or refusal to perform or discharge any obligation or liability of Borrower under any agreement related to the Property or under this Deed; or

(iii)     Any loss sustained by Borrower or any third party resulting from Lender's failure to lease the Property, or from any other act or omission of Lender in managing the Property, after an Event of Default, unless the loss is caused by the willful misconduct and bad faith of Lender.

Borrower hereby expressly waives and releases all liability of the types described above, and agrees that no such liability shall be asserted against or imposed upon Lender.

(c)     Borrower agrees to indemnify, defend and hold Lender harmless from all losses, damages, liabilities, claims, causes of action, judgments, court costs, reasonable attorneys' fees and other legal expenses, cost of evidence of title, cost of evidence of value, and other costs and expenses which Lender may suffer or incur:

(i)     In performing any act required or permitted by this Deed or any of the other Loan Documents or by law;

(ii)     Because of any failure of Borrower to perform any of its obligations; or

(iii)     Because of any alleged obligation of or undertaking by Lender to perform or discharge any of the representations, warranties, conditions, covenants or other obligations in any document relating to the Property other than the Loan Documents.

This agreement by Borrower to indemnify Lender shall survive the release and cancellation of any or all of the Secured Obligations and the full or partial release of this Deed.

(d)     Borrower shall pay all obligations to pay money arising under this Section 5.7 immediately upon demand by Lender. Each such obligation shall be added to, and considered to be part of, the principal of the Note, and shall bear interest from the date the obligation arises at the Default Rate.

5.8     Defense and Notice of Claims and Actions.     At Borrower's sole expense, Borrower shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this Deed and the rights and powers of Lender created under it, against all adverse claims. Borrower shall give Lender prompt notice in writing if any claim is asserted which does or could affect any such matters, or if any action or proceeding is commenced which alleges or relates to any such claim. Lender may, at the expense of Borrower, appear in and defend any such claim, action or proceeding and any claim, action or other proceeding asserted or brought against Lender in connection with or relating to any part of the Property or this Deed.

5.9     Subrogation.     Lender shall be subrogated to the liens of all encumbrances, whether released of record or not, which are discharged in whole or in part by Lender in accordance with this Deed or with the proceeds of any loan secured by this Deed.

6.     Transfers, D     and Remedies.

6.1     Accelerating Transfers.

(a)     "Accelerating Transfer" means any Transfer not expressly permitted under Section 4.2.1(c) of the Loan Agreement.

(b)     Borrower acknowledges that Lender is making one or more advances under the Loan Agreement in reliance on the expertise, skill and experience of Borrower; thus, the Secured Obligations include material elements similar in nature to a personal service contract. In consideration of Lender's reliance, Borrower agrees that Borrower shall not make any Accelerating Transfer, unless the transfer is preceded by Lender's express written consent to the particular transaction and transferee. Lender may withhold such consent in its sole discretion. If any Accelerating Transfer occurs, Lender in its sole discretion may declare all of the Secured Obligations to be immediately due and payable, and Lender may invoke any rights and remedies provided by this Section 6.

6.2     Events of Default.     Borrower will be in default under this Deed upon the occurrence of any one or more of the following events (some or all collectively, "Events of Default;" any one singly, an "Event of Default").

(a)     Failure of Borrower for a period of thirty (30) days after written notice from Lender, to observe or perform any non-monetary covenant or condition contained in this Deed or any of the other Loan Documents; provided that if any such failure concerning a non-monetary covenant or condition is susceptible to cure but cannot reasonably be cured within said thirty (30) day period, then Borrower shall have an additional sixty (60) day period to cure such failure and no Event of Default shall be deemed to exist hereunder so long as Borrower commences such cure within the initial thirty (30) day period and diligently and in good faith pursues such cure to completion within such resulting ninety (90) day period from the date of Lender's notice, and provided further that if a different notice or grace period is specified under Article X of the Loan Agreement (or elsewhere in this Deed or the Loan Agreement) in which such particular breach will become an Event of Default, the specific provision shall control;

(b)     Lender receives, at any time following the closing of the Loan, an official report indicating that Lender's security interest is not prior to all other security interests or other interests reflected in the report other than Permitted Exceptions; or

(c)     An "Event of Default" occurs under the Loan Agreement or any other Loan Document.

6.3     Remedies of the Lender.  If an Event of Default shall have occurred then the entire Obligations shall, at the option of the Lender, immediately become due and payable without notice, except as specifically provided herein, in the Note, and in the Loan Documents, time being of the essence of this Deed; and no omission on the part of the Lender to exercise such option when entitled to do so shall be construed as a waiver of such right.

6.4     Right to Enter and Take Possession.

(a)  If an Event of Default shall have occurred and be continuing, Borrower, upon demand of the Lender, shall forthwith surrender to the Lender the actual possession of the Property and if, and to the extent, permitted by law, the Lender itself, or by such officers or agents as it may appoint, may enter and take possession of all the Property without the appointment of a receiver, or an application therefor, and may exclude Borrower and its agents and employees wholly therefrom, and may have joint access with Borrower to the books, papers and accounts of Borrower relating to the Property.

(b)  Subject to the terms and conditions of Section 6.4(a) herein, if Borrower shall for any reason fail to surrender or deliver the Property or any part thereof after such demand by the Lender, the Lender may obtain a judgment or decree conferring upon the Lender the right to immediate possession or requiring Borrower to deliver immediate possession of the Property to the Lender, and Borrower hereby specifically covenants and agrees that Borrower will not oppose, contest or otherwise hinder or delay the Lender in any action or proceeding by the Lender to obtain such judgment or decree. Borrower will pay to the Lender, upon demand, all expenses of obtaining such judgment or decree, including reasonable compensation to the Lender's attorneys and agents; and all such expenses and compensation shall, until paid, become part of the Obligations and shall be secured by this Deed.

(c)  Subject to the terms and conditions of Section 6.4(a) herein, upon every such entering upon or taking of possession, the Lender may hold, store, use, operate, manage and control and maintain the Property and conduct the business thereof, and, from time to time

(i) make all necessary and proper maintenance, repairs, renewals, replacements, additions, betterments and improvements thereto and thereon and purchase or otherwise acquire additional fixtures, personalty and other property; (ii) insure or keep the Property insured; (iii) manage and operate the Property and exercise all the rights and power of Borrower to the same extent as Borrower could in its own name or otherwise with respect to the same; and (iv) enter into any and all agreements with respect to the exercise by others of any of the powers herein granted the Lender, all as the Lender from time to time may determine to be in its best interest. The Lender may collect and receive all the income, rents, issues, profits and revenues from the Property, including those past due as well as those accruing thereafter, and the Lender may apply any money and proceeds received by the Lender, in whatever order or priority the Lender in its sole discretion may determine, to the payment of (i) all expenses of taking, holding, managing and operating the Property (including reasonable compensation for the services of all persons employed for such purposes); (ii) the cost of all such maintenance, repairs, renewals, replacements, additions, betterments, improvements, purchases and acquisitions; (iii) the cost of such insurance; (iv) such taxes, assessments and other similar charges as the Lender may at its option pay; (v) other proper charges upon the Property or any part thereof; (vi) the reasonable compensation, expenses and disbursements of the attorneys and agents of the Lender; (vii) accrued interest; (viii) deposits and other sums required to be paid under this Deed; and (ix) overdue installments of principal. Anything in this Section 6.4(c) to the contrary notwithstanding, the Lender shall not be obligated to discharge or perform the duties of a landlord to any tenant or incur any liability as the result of any exercise by the Lender of its rights under this Deed, nor shall the Lender be responsible or liable for any waste committed on the Property by any tenant or other person or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in any loss, injury or death to any tenant, licensee, employee, or stranger, and the Lender shall be liable to account only for the rents, incomes, issues, profits and revenues actually received by the Lender.

(d)  For the purpose of carrying out the provisions of this Section 6.4, the Borrower hereby constitutes and appoints the Lender the true and lawful attorney in fact of the Borrower to do and perform, from time to time, any and all actions necessary and incidental to such purpose and does, by these presents, ratify and confirm any and all actions of said attorney in fact.

(e)  In the event that all such interest, deposits and principal installments and other sums due under any of the terms, covenants, conditions and agreements of this Deed shall be paid and all Events of Defaults shall be cured, and as a result thereof the Lender surrenders possession of the Property to Borrower, the same right of taking possession shall continue to exist if any subsequent Event of Default shall occur.

6.5  Performance by the Lender.  If Borrower shall default in the payment, performance or observance of any term, covenant or condition of this Deed and after the expiration of any applicable grace or notice and cure period, if any, the Lender may, at its option, pay, perform or observe the same, and all reasonably necessary payments made or reasonable costs or expenses incurred by the Lender in connection therewith shall be secured hereby and shall be, upon demand, immediately repaid by Borrower to the Lender with interest thereon at the default rate provided in the Note. The Lender shall be the sole judge of the necessity for any such actions and of the amounts to be paid. The Lender is hereby empowered to enter and to authorize others to enter upon the Property or any part thereof for the purpose of performing or

observing any such defaulted term, covenant or condition without thereby becoming liable to Borrower or any person in possession holding under Borrower.

6.6    Receiver.   If an Event of Default shall have occurred and be continuing, the Lender, upon application to a court of competent jurisdiction, shall be entitled as a matter of strict right without notice and without regard to the adequacy or value of any security for the indebtedness secured hereby or the solvency of any party bound for its payment, to the appointment of a receiver to take possession of and to operate the Property and to collect and apply the rents, issues, profits and revenues thereof. The receiver shall have all the rights and powers permitted under the laws of the State of Georgia. Borrower will pay to the Lender upon demand all reasonable expenses, including reasonable receiver's fees, reasonable attorneys' fees, reasonable costs and reasonable agent's compensation, incurred pursuant to the provisions of this Section 6.6; and any such amounts paid by the Lender shall be added to the Obligations and shall be secured by this Deed.

6.7    Enforcement.

(a)   When the Obligations shall become due, whether by acceleration or at maturity and Borrower fails to pay the Obligations in full at maturity, the Lender, at its option, may sell the Property or any part of the Property at public sale or sales before the door of the courthouse of the county in which the Property or any part of the Property is situated, to the highest bidder for cash, in order to pay the Obligations and all expenses of the sale and of all proceedings in connection therewith, including reasonable attorneys' fees actually incurred, after advertising the time, place and terms of sale once a week for four (4) weeks immediately preceding such sale (but without regard to the number of days) in a newspaper in which Sheriffs sales are advertised in said county. At any such public sale, the Lender may execute and deliver to the purchaser a conveyance of the Property or any part of the Property in fee simple, with full warranties of title, and to this end, Borrower hereby constitutes and appoints the Lender the agent and attorney-in-fact of Borrower to make such sale and conveyance, and thereby to divest Borrower of all right, title or equity that Borrower may have in and to the Property and to vest the same in the purchaser or purchasers at such sale or sales, and all the acts and doings of said agent and attorney-in-fact are hereby ratified and confirmed and any recitals in said conveyance or conveyances as to facts essential to a valid sale shall be binding upon Borrower. The aforesaid power of sale and agency hereby granted are coupled with an interest and are irrevocable by death or otherwise, and are granted as cumulative of the other remedies provided hereby or by law for collection of the Obligations and shall not be exhausted by one exercise thereof but may be exercised until full payment of all of the Obligations. In the event of any sale under this Deed by virtue of the exercise of the powers herein granted, or pursuant to any order in any judicial proceeding or otherwise, the Property may be sold as an entirety or in separate parcels and in such manner or order as the Lender in its sole discretion may elect, and if the Lender so elects, the Lender may sell the personal property covered by this Deed at one or more separate sales in any manner permitted by the UCC, and one or more exercises of the powers herein granted shall not extinguish nor exhaust such powers, until the entire Property are sold or the Obligations is paid in full. If the Obligations is now or hereafter further secured by any chattel mortgages, pledges, contracts of guaranty, assignments of lease or other security instruments, the Lender may at its option exhaust the remedies granted under any of said security instruments either concurrently or independently, and in such order as the Lender may determine. The Lender may adjourn from time to time any sale by it to be made under or by virtue of this Deed by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable provision of law,

the Lender, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(b)  If an Event of Default shall have occurred and be continuing, the Lender may, in addition to and not in abrogation of the rights covered under subsection (a) of this Section 6.7, either with or without entry or taking possession as herein provided or otherwise, proceed by a suit or suits in law or in equity or by any other appropriate proceeding or remedy (i) to enforce payment of the Note or the performance of any term, covenant, condition or agreement of this Deed or any other right under the Loan Documents, and (ii) to pursue any other remedy available to it, all as the Lender shall determine most effectual for such purposes.

6.8     Purchase by the Lender.  Upon any foreclosure sale or sales of all or any portion of the Property under the power herein granted, the Lender may bid and purchase at such sale or sales and shall be entitled to apply all or any part of the Obligations as a credit to the purchase price.

6.9     Application of Proceeds of Sale.  In the event of a foreclosure or a sale of all or any portion of the Property under the power herein granted, the proceeds of said sale shall be applied, in whatever order the Lender in its sole discretion may decide, to the expenses of such sale and of all proceedings in connection therewith, including reasonable attorney's fees actually incurred, to insurance premiums, liens, assessments, taxes and charges including utility charges advanced by the Lender, to costs incurred by the Lender in connection with any environmental surveys and testing of the Property, to all other advances made by the Lender pursuant to this Deed, to payment of the outstanding principal balance of the Obligations, and to the accrued interest on all of the foregoing; and the remainder, if any, shall be paid to Borrower, or to the person or entity lawfully entitled thereto.

6.10     Borrower as Tenant Holding Over.  In the event of any such foreclosure sale or sales under the power herein granted, Borrower shall be deemed a tenant holding over and shall forthwith deliver possession to the purchaser or purchasers at such sale or be summarily dispossessed according to provisions of law applicable to tenants holding over.

6.11     Waiver of Appraisement, Valuation, Etc.  Borrower agrees to the full extent permitted by law, that in case of a default on the part of Borrower hereunder and after expiration of any applicable cure period, if any, neither Borrower nor anyone claiming through or under Borrower shall or will set up, claim or seek to take advantage of any moratorium, reinstatement, forbearance, appraisement, valuation, stay, extension, homestead, exemption or redemption laws now or hereafter in force, in order to prevent or hinder the enforcement or foreclosure of this Deed, or the absolute sale of the Property, or the delivery of possession thereof immediately after such sale to the purchaser at such sale, and Borrower, for itself and all who may at any time claim through or under it, hereby waives to the full extent that it may lawfully so do, the benefit of all such laws, and any and all right to have the assets subject to the security interest of this Deed marshalled upon any foreclosure or sale under the power herein granted.

6.12     Waiver of Homestead.  Borrower hereby waives and renounces all homestead and exemption rights provided for by the Constitution and the laws of the United States and of any state, in and to the Property as against the collection of the Obligations, or any part thereof.

6.13     Leases.  The Lender, at its option, is authorized to foreclose this Deed subject to the rights of any tenants of the Property, and the failure to make any such tenants parties to any

Deed to Secure Debt and Security Agreement          - 14 -
BOI 15867819.3 137050-000044

such foreclosure proceedings and to foreclose their rights will not be, nor be asserted to be by Borrower, a defense to any proceedings instituted by the Lender to collect the Obligations.

6.14   Discontinuance of Proceedings.   In case the Lender shall have proceeded to enforce any right, power or remedy under this Deed by foreclosure, entry or otherwise or in the event the Lender commences advertising of the intended exercise of power of sale, entry or otherwise, and such proceeding or advertisement shall have been withdrawn, discontinued or abandoned for any reason, or shall have been determined adversely to the Lender, then and in every such case (i) Borrower and the Lender shall be restored to their former positions and rights, (ii) all rights, powers and remedies of the Lender shall continue as if no such proceeding had been taken, (iii) each and every Event of Default declared or occurring prior or subsequent to such withdrawal, discontinuance or abandonment and not cured shall be a continuing Event of Default, and (iv) neither this Deed, nor the Note, nor the Obligations, nor any other instrument concerned therewith, shall be or shall be deemed to have been reinstated or otherwise affected by such withdrawal, discontinuance or abandonment; and Borrower hereby expressly waives the benefit of any statute or rule of law now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the above.

7,   Miscellaneous Provisions.

7.1   Additional Provisions.   The Loan Documents fully state all of the terms and conditions of the parties' agreement regarding the matters mentioned in or incidental to this Deed. The Loan Documents also grant further rights to Lender and contain further agreements and affirmative and negative covenants by Borrower which apply to this Deed and to the Property.

7.2   No Waiver or Cure.   If any of the events described below occurs, that event alone shall not: cure or waive any breach, Event of Default or notice of default under this Deed or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed and all other defaults under the Loan Documents have been cured); or impair the security of this Deed; or prejudice Lender or any receiver in the exercise of any other right or remedy afforded any of them under this Deed; or be construed as an affirmation by Lender of any tenancy, lease or option, or a subordination of the lien of this Deed.

(a)   Lender, its agent or a receiver takes possession of all or any part of the Property in the manner provided in Subsection 6.4.

(b)   Lender collects and applies Rents as permitted under Section 2.3 above, either with or without taking possession of all or any part of the Property.

(c)   Lender receives and applies to any Secured Obligation any proceeds of any Property, including any proceeds of insurance policies, condemnation awards, or other claims, property or rights assigned to Lender under Section 5.4 above.

(d)   Lender makes a site visit, observes the Property and/or conducts tests as permitted under the Loan Agreement.

(e)   Lender receives any sums under this Deed or any proceeds of any collateral held for any of the Secured Obligations, and applies them to one or more Secured Obligations.

(f)     Lender or any receiver invokes any right or remedy provided under this Deed.

**7.3     Powers of Lender.**

(a)     ~~If Lender performs any act which it is empowered or authorized to perform under~~ this Deed, that act alone shall not release or change the personal liability of any person for the payment and performance of the Secured Obligations then outstanding, or the lien of this Deed on all or the remainder of the Property for full payment and performance of all outstanding Secured Obligations. The liability of the original Borrower shall not be released or changed if Lender grants any successor in interest to Borrower any extension of time for payment, or modification of the terms of payment, of any Secured Obligation. Lender shall not be required to comply with any demand by the original Borrower that Lender refuse to grant such an extension or modification to, or commence proceedings against, any such successor in interest.

(b)     Lender may take any of the actions permitted under Section 6 regardless of the adequacy of the security for the Secured Obligations, or whether any or all of the Secured Obligations have been declared to be immediately due and payable, or whether notice of default and election to sell has been given under this Deed.

(c)     From time to time, Lender may apply to any court of competent jurisdiction for aid and direction in executing and enforcing the rights and remedies created under this Deed. Lender may from time to time obtain orders or decrees directing, confirming or approving acts in executing and enforcing these rights and remedies.

**7.4     Merger.** No merger shall occur as a result of Lender's acquiring any other estate in or any other lien on the Property unless Lender consents to a merger in writing.

**7.5     Joint and Several Liability.** If Borrower consists of more than one person, each shall be jointly and severally liable for the faithful performance of all of Borrower's obligations under this Deed and the other Loan Documents.

**7.6     Applicable Law.** The creation, perfection and enforcement of the lien of this Deed shall be governed by the law of the State in which the property is located. Subject to the foregoing, in all other respects, this Deed shall be governed by the substantive laws of the State of Illinois.

**7.7     Intentionally Omitted.**

**7.8     Waiver of Statutory Rights.** To the extent permitted by law, Borrower hereby agrees that it shall not and will not apply for or avail itself of any appraisement, valuation, stay, extension or exemption laws, or any so-called "moratorium laws," now existing or hereafter enacted, in order to prevent or hinder the enforcement or foreclosure of this Deed, but hereby waives the benefit of such laws. Borrower for itself and all who may claim through or under it waives any and all right to have the property and estates comprising the Property marshalled upon any foreclosure of the lien hereof and agrees that any court having jurisdiction to foreclose such lien may order the Property sold as an entirety. Borrower hereby waives any and all rights of redemption from sale under any judgment of foreclosure of this Deed on behalf of Borrower and on behalf of each and every person acquiring any interest in or title to the Property of any nature whatsoever, subsequent to the date of this Deed. The foregoing waiver of right of redemption is made pursuant to the provisions of applicable law.

**7.9     Notice.** Notices shall be given under this Deed in conformity with the terms and conditions of the Loan Agreement and in conformity with applicable law.

**7.10     Future Advances.** This Deed is given to secure not only the existing Indebtedness, but also future advances (whether such advances are obligatory or are made at the option of Lender, or

otherwise) made by Lender under the Note or this Deed, to the same extent as if such future advances were made on the date of the execution of this Deed. The total amount of Indebtedness secured hereby may increase or decrease from time to time, but the total unpaid principal balance of indebtedness secured hereby (including disbursements that the Lender may, but shall not be obligated to, make under this Deed, the Loan Documents or any other document with respect thereto) at any one time outstanding may be substantially less but shall not exceed five (5) times the aggregate face amount of the Note. This Deed shall be valid and have priority to the extent of the maximum amount secured hereby over all subsequent liens and encumbrances, including statutory liens, excepting solely taxes and assessments levied on the Property given priority by law.

7.11 WAIVER OF TRIAL BY JURY. TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY CLAIM, CONTROVERSY, DISPUTE, ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS DEED AND THE OTHER LOAN DOCUMENTS (INCLUDING WITHOUT LIMITATION ANY ACTIONS OR PROCEEDINGS FOR ENFORCEMENT OF THE LOAN DOCUMENTS) AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWER AND LENDER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH OF THEM HAVE RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THAT EACH OF THEM WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. BORROWER AND LENDER WARRANT AND REPRESENT THAT EACH HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

7.12 WAIVER OF BORROWER'S RIGHTS. BY EXECUTION OF THIS DEED, BORROWER EXPRESSLY: (A) ACKNOWLEDGES THE RIGHT OF LENDER TO ACCELERATE THE INDEBTEDNESS EVIDENCED BY THE NOTE AND ANY OTHER INDEBTEDNESS AND THE POWER OF ATTORNEY GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY BORROWER WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE (IF ANY) AS IS SPECIFICALLY REQUIRED TO BE GIVEN UNDER THE PROVISIONS OF THIS DEED; (B) WAIVES ANY AND ALL RIGHTS WHICH BORROWER MAY HAVE UNDER THE CONSTITUTION OF THE UNITED STATES (INCLUDING, WITHOUT LIMITATION, THE FIFTH AND FOURTEENTH AMENDMENTS THEREOF), THE VARIOUS PROVISIONS OF THE CONSTITUTIONS FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW, (1) TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE (IF ANY) AS IS SPECIFICALLY REQUIRED TO BE GIVEN UNDER THE PROVISIONS OF THIS DEED AND (2) CONCERNING THE APPLICATION, RIGHTS OR BENEFITS OF ANY STATUTE OF LIMITATION OR ANY MORATORIUM, REINSTATEMENT,

MARSHALLING, FORBEARANCE, APPRAISEMENT, VALUATION, STAY, EXTENSION; HOMESTEAD, EXEMPTION OR REDEMPTION LAWS; (C) ACKNOWLEDGES THAT BORROWER HAS READ THIS DEED, AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF THIS DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO BORROWER AND BORROWER HAS CONSULTED WITH COUNSEL OF BORROWER'S CHOICE PRIOR TO EXECUTING THIS DEED; AND (D) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF BORROWER HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY BORROWER AS PART OF A BARGAINED FOR LOAN TRANSACTION AND THAT THIS DEED IS VALID AND ENFORCEABLE BY LENDER AGAINST BORROWER IN ACCORDANCE WITH ALL THE TERMS AND CONDITIONS HEREOF.

BORROWER: _____

7.13 Inconsistencies. In the event of any inconsistency between this Deed and the Loan Agreement, the terms hereof shall be controlling as necessary to create, preserve and/or maintain a valid security interest upon the Property, otherwise the provisions of the Loan Agreement shall be controlling. The terms of the Loan Agreement are hereby incorporated herein and expressly made a part hereof by this reference.

7.14 Further Assurances. Borrower agrees to execute any further documents, and to take any further actions reasonably requested by Lender to evidence or perfect the security interests granted herein, to maintain the first priority of the security interests, and to effectuate the rights granted to Lender hereunder.

7.15 Successors and Assigns. This Deed shall inure to the benefit of and be binding upon Borrower and Lender and their respective heirs, executors, legal representatives, successors, successors-in-title and assigns. Whenever a reference is made in this Deed to Borrower or Lender such reference shall be deemed to include a reference to the heirs, executors, legal representatives, successors, successors-in-title and assigns of Borrower and Lender, as the case may be. The provisions of this Section 7.15 are subject to the restrictions on transfer contained herein.

7.16 Terminology. All personal pronouns used in this Deed, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural, and vice versa. Titles of articles and sections are for convenience only and neither limit nor amplify the provisions of this Deed, and all references herein to articles, sections, subsections, paragraphs or subparagraphs thereof, shall refer to the corresponding articles, sections, subsections, paragraphs or subparagraphs of this Deed unless specific reference is made to articles, sections, subsections, paragraphs or subparagraphs of another document or instrument.

7.17 Severability. If any provision of this Deed shall be held to be invalid, illegal or unenforceable, in whole or in part, or if any provision of this Deed shall operate to invalidate this Deed, then such provision or provisions only shall be deemed to be null and void and of no force or effect and shall not affect any other provision of this Deed; the remaining provisions of this Deed shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

Deed to Secure Debt and Security Agreement

**7.18**   Intentionally Omitted.

**7.19**   Replacement of Note.   Upon receipt of evidence reasonably satisfactory to Borrower of the loss, theft, destruction or mutilation of the Note, and in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement, reasonably satisfactory to Borrower or in the case of any such mutilation, upon surrender of the Note, Borrower will execute and deliver, in lieu thereof, a replacement Note, identical in form and substance to the Note and dated as of the date of the Note and upon such execution and delivery all references in this Deed to the Note shall be deemed to refer to such replacement Note.

**7.20**   Assignment of Rents, Income, Proceeds and Leases.   The Borrower hereby assigns and grants a security interest to the Lender in all of the Leases and all of the cash, accounts, accounts receivable, general intangibles, rents and income derived or arising from the Borrower's business operations on the Property as additional security for the indebtedness secured hereby; the Lender may, at any time after the occurrence of an Event of Default hereunder, without any additional notice and without regard to the adequacy of any security for such indebtedness and with or without the appointment of a receiver, to enter upon and take possession of the Property and collect such cash, accounts, accounts receivable, general intangibles, rents and income, including those past due and unpaid and apply the same, less the cost of operation, maintenance and repair and reasonable collection, management and reasonable attorney fees, in reduction of the indebtedness secured hereby in such order or proportion as the Lender may determine. The collection of such cash, accounts, accounts receivable, general intangibles, rents and income shall not cure or waive any default hereunder. The Lender shall not be liable to the Borrower, anyone claiming under or through the Borrower or anyone having an interest in the Property by reason of anything done or left undone by the Lender under this Article, and the Borrower shall indemnify the Lender and each of the lenders from any and all liability, loss or damage which it may incur under any lease or by reason of assignment thereof and from any claims or demands which may be asserted against it by reason of any alleged obligation on its part to perform any of the terms of said lease; provided, however, that the obligation so to indemnify shall not extend to liability arising from or occasioned by any actions taken by the Lender or any receiver appointed for the Lender after the date the Lender or any such receiver has assumed control of the Property. The Borrower warrants that there are no outstanding assignments or pledges of the cash, accounts, accounts receivable, general intangibles, rents and income derived or arising from the Borrower's business operations on the Property.

**7.21**   Time of the Essence.   Time is of the essence with respect to each and every covenant, agreement and obligation of Borrower under this Deed, the Note and any and all other instruments now or hereafter evidencing, securing or otherwise relating to the Obligations.

**7.22**   Consent to Jurisdiction.   Borrower hereby (a) submits and consents to personal jurisdiction in the State of Georgia for the enforcement of this Deed, and (b) expressly waives any and all personal rights under the law of any state to object to jurisdiction and/or venue within the State of Georgia for purposes of litigation to enforce this Deed. In the event that such litigation is commenced, Borrower agrees that service of process may be made, and personal jurisdiction obtained, by the serving of a copy of the summons and complaint upon Borrower's appointed agent for service of process in the State of Georgia, whose name and address is as follows:

Corporation Service Company
40 Technology Parkway South, #300.

Norcross, Georgia 30092

7.23   Attorney's Fees.   Borrower and Lender acknowledge and agree that any reference in the Agreement or any of the other Loan Documents to "attorney's fees", "legal fees" or words of similar intent shall mean reasonable attorney's fees actually incurred at standard hourly rates without any statutory presumption and without the application of O.C.G.A. Section 13-1-11. All references in this Agreement to "reasonable attorney's fees," "reasonable counsel fees", "reasonable attorneys' fees and costs", "legal fees", "reasonable counsel fees and disbursements", "reasonable fees of counsel", "reasonable fees of attorneys" and similar expressions shall be deemed to mean reasonable attorneys', paralegals', law clerk and agents' compensation, fees, costs, expenses and disbursements, including but not limited to, fees and disbursements for review, investigation, analysis, consultation, negotiation, and any dispute resolution by mediation, arbitration, litigation at the pre-trial, trial and appellate levels, or any other process or procedure.

7.24   Exculpation.   The provisions of Section 12.2) of the Loan Agreement are incorporated herein and made a part hereof.

*[Signature appears on the following page.]*

IN WITNESS WHEREOF, Borrower has executed this Deed as of the date first above written.

Signed, sealed and delivered
in the presence of:

IBS COBBLESTONE OPERATING, LLC,
a Georgia limited liability company

Witness

By: _____
Alan T. Schiffman, Vice President

Notary Public

My Commission Expires: 8-28-07

[NOTARIAL SEAL]

AMANDA CREGAN
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES AUG. 28, 2007

Deed to Secure Debt and Security Agreement

*EXHIBIT A*
*Description of Premises*

01-0375901

## Legal Description

### Tract "A"

All that tract or parcel of land lying and being in Land Lot 121 of the 5th District of Fayette County, Georgia and being more particularly described as follows:

To arrive at the TRUE POINT OF BEGINNING, begin at a point at the southeast corner of Land Lot 121 (said point being the common corner for Land Lots 104, 105, 120 & 121); thence westerly along the southerly line of said Land Lot 887.00 feet to a ½ inch rebar found and the TRUE POINT OF BEGINNING; thence North 89 degrees 04 minutes 33 seconds West a distance of 661.88 feet to a ½ inch rebar found; thence North 89 degrees 07 minutes 49 seconds West a distance of 334.13 feet to a ½ inch rebar found; thence North 00 degrees 29 minutes 34 seconds East a distance of 853.01 feet to a ½ inch rebar found; thence South 89 degrees 28 minutes 01 seconds East a distance of 111.77 feet to a ½ inch rebar found; thence North 00 degrees 34 minutes 58 seconds East a distance of 45.82 feet to a ½ inch rebar found; thence North 69 degrees 59 minutes 47 seconds East a distance of 204.01 feet to a ½ inch rebar found; thence South 19 degrees 57 minutes 56 seconds East a distance of 22.73 feet to a ½ inch rebar found; thence North 70 degrees 00 minutes 47 seconds East a distance of 97.42 feet to a ½ inch rebar found; thence North 00 degrees 16 minutes 14 seconds East a distance of 62.00 feet to a ½ inch rebar; thence South 88 degrees 18 minutes 53 seconds East a distance of 284.53 feet to a ½ inch rebar found; thence South 88 degrees 18 minutes 53 seconds East a distance of 64.30 feet to a ½ inch rebar found; thence South 88 degrees 18 minutes 53 seconds East a distance of 250.11 feet to a ½ inch rebar found; thence South 00 degrees 44 minutes 39 seconds West a distance of 1039.70 feet to said ½ inch rebar found and the TRUE POINT OF BEGINNING. Said tract containing 22.7839 acres as shown on survey prepared by Pearson & Associates, Inc. dated April 16, 2001, last revised August 3, 2007.

01-0375901

# Legal Description

## Tract "B"

All that tract or parcel of land lying and being in Land Lot 121 of the 5th District of Fayette County, Georgia and being more particularly described as follows:

To arrive at the TRUE POINT OF BEGINNING, begin at a point at the southeast corner of Land Lot 121 (said point being the common corner for Land Lots 104, 105, 120 & 121); thence westerly along the southerly line of said Land Lot 887.00 feet to a ½ inch rebar found; thence North 00 degrees 44 minutes 39 seconds East a distance of 1039.70 feet to a 1/2 inch rebar found; thence North 85 degrees 54 minutes 51 seconds West a distance of 50.08 feet to a point and the TRUE POINT OF BEGINNING; thence from said TRUE POINT OF BEGINNING thus established, North 88 degrees 18 minutes 53 seconds West a distance of 200.59 feet to a point on the easterly side of Cobblestone Parkway (Private Drive); thence along said drive along a curve to the left an arc distance of 64.33 feet (being subtended by a chord distance of 63.49 feet, a bearing North 00 degrees 06 minutes 34 seconds West and a 114.94 foot radius) to a point; thence North 16 degrees 08 minutes 39 seconds West a distance of 128.92 feet to a point; thence along a curve to the right an arc distance of 155.54 feet (being subtended by a chord distance of 154.86 feet, a bearing North 06 degrees 54 minutes 09 seconds West and a 482.14 foot radius) to a point; thence North 03 degrees 15 minutes 46 seconds East a distance of 449.43 feet to a point; thence departing said drive North 85 degrees 59 minutes 25 seconds East a distance of 121.09 feet to a point; thence North 04 degrees 00 minutes 27 seconds West a distance of 65.00 feet to a point; thence North 89 degrees 21 minutes 18 seconds East a distance of 125.16 feet to a point; thence South 00 degrees 46 minutes 59 seconds West a distance of 870.47 feet to said point and the TRUE POINT OF BEGINNING. Said tract containing 4.6194 acres as shown on survey prepared by Pearson & Associates, Inc., dated April 16,2001, last revised August 3,2007.

01-0375901

## Legal Description

### Tract "C"

All that tract or parcel of land lying and being in Land Lot 121 of the 5th District of Fayette County, Georgia and being more particularly described as follows:

To arrive at the TRUE POINT OF BEGINNING, begin at a point at the southeast corner of Land Lot 121 (said point being the common corner for Land Lots 104, 105, 120 & 121); thence westerly along the southerly line of said Land Lot 887.00 feet to a ½ inch rebar found; thence North 00 degrees 44 minutes 39 seconds East a distance of 1039.70 feet to a ½ inch rebar found and the TRUE POINT OF BEGINNING; thence from said TRUE POINT OF BEGINNING thus established, North 85 degrees 54 minutes 51 seconds West a distance of 50.08 feet to a point; thence North 00 degrees 46 minutes 59 seconds East a distance of 1101.69 feet to a concrete monument found on the southerly right-of-way of Georgia Highway No. 54 (R/W varies); thence along said right-of-way along a curve to the left an arc distance of 51.52 feet (being subtended by a chord distance of 51.52 feet, a bearing North 76 degrees 49 minutes 42 seconds East and a 1984.86 foot radius) to a ½ inch rebar set; thence departing said right-of-way South 00 degrees 46 minutes 59 seconds West a distance of 1117.00 feet to said ½ inch rebar found and the TRUE POINT OF BEGINNING. Said tract containing 1.2731 acres as shown on survey prepared by Pearson & Associates, Inc., dated April 16, 2001, last revised August 3, 2007.

00-0874506

# Legal Description

### "Private Drive"

All that tract or parcel of land lying and being in Land Lot 121 of the 5th District of Fayette County, Georgia and being more particularly described as follows:

To arrive at the TRUE POINT OF BEGINNING, begin at a point at the southeast corner of Land Lot 121 (said point being the common corner for Land Lots 104, 105, 120 & 121); thence westerly along the southerly line of said Land Lot 887.00 feet to a ½ inch rebar found; thence North 00 degrees 44 minutes 39 seconds East a distance of 1039.70 feet to a ½ inch rebar found; thence North 85 degrees 54 minutes 51 seconds West a distance of 50.08 feet to a point; thence North 88 degrees 18 minutes 53 seconds West a distance of 200.59 feet to a ½ inch rebar found on the easterly side of Cobblestone Parkway (private drive) and the TRUE POINT OF BEGINNING; thence North 88 degrees 18 minutes 53 seconds West a distance of 64.30 feet to a ½ inch rebar found on the westerly side of said Cobblestone Parkway; thence along Cobblestone Parkway the following courses and distances: along a curve to the left an arc distance of 46.79 feet (being subtended by a chord distance of 45.39 feet a bearing of North 08 degrees 15 minutes 25 seconds East and a 54.94 foot radius) to a point; thence North 16 degrees 08 minutes 39 seconds West a distance of 128.92 feet to a point; thence along a curve to the right an arc distance of 174.89 feet (being subtended by a chord distance of 174.13 feet, a bearing of North 06 degrees 54 minutes 09 seconds West and a 542.14 foot radius) to a point; thence North 03 degrees 12 minutes 16 seconds East a distance of 432.26 feet to a point; thence along a curve to the left an arc distance of 82.34 feet (being subtended by a chord distance of 82.23 feet, a bearing of North 00 degrees 42 minutes 36 seconds East and a 470.00 foot radius) to a point; thence South 85 degrees 41 minutes 28 seconds West a distance of 10.00 feet to a point; thence North 04 degrees 18 minutes 32 seconds West a distance of 195.55 feet to a point on the southerly right-of-way of Georgia Highway No. 54 (R/W varies); thence along said right-of-way of Georgia Highway No. 54 along a curve to the left an arc distance of 80.00 feet (being subtended by a chord distance of 80.00 feet, a bearing of North 86 degrees 01 minutes 36 seconds East and a 1984.86 foot radius) to a point on the easterly side of Cobblestone Parkway; thence along Cobblestone Parkway the following courses and distances: South 04 degrees 18 minutes 32 seconds East a distance of 195.08 feet to a point; thence South 85 degrees 41 minutes 28 seconds West a distance of 10.00 feet to a point; thence along a curve to the right an arc distance of 72.13 feet (being subtended by a chord distance of 72.07 feet, a bearing of South 00 degrees 24 minutes 36 seconds East and a 530.00 foot radius) to a point; thence South 03 degrees 15 minutes 46 seconds West a distance of 449.43 feet to a point; thence along a curve to the left an arc distance of 155.54 feet (being subtended by a chord distance of 154.86 feet, a bearing of South 06 degrees 54 minutes 09 seconds East and a 482.14 foot radius) to a point; thence South 16 degrees 08 minutes 39 seconds East a distance of 128.92 feet to a point; thence along a curve to the right an arc distance of 64.33 feet (being subtended by a chord distance of 63.49 feet a bearing of South 00 degrees 06 minutes 34 seconds East and a 114.94 foot radius) to said point and the TRUE POINT OF BEGINNING. Said tract containing 1.5554 acres as shown on survey prepared by Pearson & Associates, Inc. dated April 16, 2001, last revised August 3, 2007.

## Legal Description

### "Phase II"

All that tract or parcel of land lying and being in Land Lot 121 of the 5th District of Fayette County, Georgia and being more particularly described as follows:

To arrive at the TRUE POINT OF BEGINNING, begin at a point at the southeast corner of Land Lot 121 (said point being the common corner for Land Lots 104, 105, 120 & 121); thence westerly along the southerly line of said Land Lot 887.00 feet to a ½ inch rebar found; thence North 00 degrees 44 minutes 39 seconds East a distance of 1039.70 feet to a ½ inch rebar found; thence North 88 degrees 18 minutes 53 seconds West a distance of 250.11 feet to a ½ inch rebar found; thence North 88 degrees 18 minutes 53 seconds West a distance of 64.30 feet to a ½ inch rebar found on the westerly side of Cobblestone Parkway and the TRUE POINT OF BEGINNING; thence North 88 degrees 18 minutes 53 seconds West a distance of 284.53 feet to a ½ inch rebar found; thence North 00 degrees 06 minutes 14 seconds East a distance of 1055.43 feet to a point on the southerly side of Georgia Highway No. 54 (R/W varies); thence along Georgia Highway No. 54 the following courses and distances: North 89 degrees 17 minutes 26 seconds East a distance of 73.04 feet to a concrete monument found; thence South 69 degrees 46 minutes 44 seconds East a distance of 53.35 feet to a concrete monument found; thence North 88 degrees 03 minutes 32 seconds East a distance of 33.58 feet to a point; thence along a curve to the left an arc distance of 76.14 feet (being subtended by a chord distance of 76.14 feet, a bearing of North 88 degrees 16 minutes 49 seconds East and a 1984.86 foot radius) to a point on the westerly side of Cobblestone Parkway (private drive); thence along Cobblestone Parkway the following courses and distances: South 04 degrees 18 minutes 32 seconds East a distance of 195.55 feet to a point; thence North 85 degrees 41 minutes 28 seconds East a distance of 10.00 feet to a point; thence along a curve to the right an arc distance of 82.34 feet (being subtended by a chord distance of 82.23 feet, a bearing of South 00 degrees 42 minutes 36 seconds West and a 470.00 foot radius) to a point; thence South 03 degrees 12 minutes 16 seconds West a distance of 432.26 feet to a point; thence along a curve to the left an arc distance 174.89 feet (being subtended by a chord distance of 174.13 feet, a bearing of South 06 degrees 54 minutes 09 seconds East and a 542.14 foot radius) to a point; thence South 16 degrees 08 minutes 39 seconds East a distance of 128.92 feet to a point; thence along a curve to the right an arc distance of 46.79 feet (being subtended by a chord distance of 45.39 feet, a bearing of South 08 degrees 15 minutes 25 seconds West and a 54.94 foot radius) to said ½ inch rebar found and the TRUE POINT OF BEGINNING. Said tract containing 6.0142 acres as shown on survey prepared by Pearson & Associates, Inc. dated October 16,2000, last revised August 3,2007.